<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                 United States Court of Appeals
                     For the First Circuit
                      ____________________

No. 98-2228

                 PUERTO RICO TELEPHONE COMPANY,

                     Plaintiff, Appellant,

                               v.

       TELECOMMUNICATIONS REGULATORY BOARD OF PUERTO RICO
      and CELLULAR COMMUNICATIONS OF PUERTO RICO, INC.,

                     Defendants, Appellees.

                                 
                      ____________________

                
          APPEAL FROM THE UNITED STATES DISTRICT COURT

                FOR THE DISTRICT OF PUERTO RICO

         [Hon. Jos Antonio Fust, U.S. District Judge]

                      ____________________
                     
                             Before

                     Lynch, Circuit Judge,
                Noonan, Senior Circuit Judge,
                  and Lipez, Circuit Judge.
                      ____________________
                     
         

 Philip J. Mause, with whom Joaqun A. Mrquez, Jeffrey J.
Lopez, and Drinker Biddle & Reath LLP were on brief, for appellant.
 Robert F. Reklaitis, with whom Veronica M. Ahern, Laurin
H. Mills, Lydia P.A. Turnipseed, Nixon, Hargrave, Devans & Doyle
LLP, Jose R. Gaztambide, and Gaztambide & Plaza were on brief, for
appellee Telecommunications Regulatory Board of Puerto Rico.
 William A. Davis, with whom Sara F. Seidman, Mintz,
Levin, Cohn, Ferris, Glovsky and Popeo, PC, and Francisco Silva
were on brief, for appellee Cellular Communications of Puerto Rico,
Inc.
 Donald B. Verrilli, Jr., Jodie L. Kelley, Katherine A.
Fallow, Jenner & Block, Thomas F. O'Neil III, Adam H. Charnes, and
Mark B. Ehrlich on brief for amicus curiae MCI Worldcom, Inc.
  

                      ____________________
                     
                     
                      ____________________

 LYNCH, Circuit Judge.  This appeal raises tricky
questions of the limits on federal court jurisdiction under 47
U.S.C.  252(e)(6), a provision of the Telecommunications Act of
1996, Pub. L. No. 104-104, 110 Stat. 56.   
 Two telecommunications companies (one primarily a
landline local exchange carrier and one a cellular carrier) reached
an interconnection agreement; the agreement in turn was approved by
the Telecommunications Regulatory Board of Puerto Rico ("the
Board") under the Act.  A dispute arose over responsibility for
certain charges and the landline company, Puerto Rico Telephone
Company ("PRTC"), started charging its customers long-distance
rates for calls to the cellular phone company's customers.  The
cellular company, Cellular Communications of Puerto Rico, Inc.
("CCPR"), struck back, filing a complaint with the Board.  The
Board found that PRTC had not violated the agreement but
nonetheless had violated its obligations of prior notice to its
customers under Puerto Rico law.  The Board ordered PRTC to make
refunds.  Faced with the loss of an alleged several million dollars
in revenue, PRTC sued in federal court, raising claims under the
Act and under the Constitution.
 Focusing closely on the particular facts, as alleged by
PRTC, of the dispute between PRTC, CCPR, and the Board, we conclude
that  252(e)(6) does not provide the federal courts with
jurisdiction over PRTC's claims.  That is because the challenged
Board order lacks a sufficient nexus with the parties'
interconnection agreement to be a determination which is subject to
review; also, the provision for federal judicial review does not
authorize review of Board actions for compliance with Puerto Rico
law.  We further conclude that PRTC's takings and procedural due
process causes of action fail to state a claim on which relief can
be granted.  We therefore affirm the dismissal of all claims, on
different reasoning than that of the district court.
                              I
 PRTC's complaint and the attached exhibits state the
following facts.  CCPR makes use of PRTC's landline network to
route and complete calls.  When a landline PRTC customer places a
call to a CCPR cellular customer, PRTC routes the call over its
landline facilities to CCPR's switch, and CCPR then forwards the
call to its final destination.  At the times relevant to the
complaint, the CCPR switch was in San Juan, and so calls from PRTC
customers to CCPR customers originating outside San Juan were long-
distance toll calls, regardless of the location in which the call
was ultimately received.
 For some time, CCPR paid PRTC a per-minute fee for
delivering these long-distance calls, and PRTC did not bill its
customers any long-distance charges.  When the Telecommunications
Act of 1996 was enacted, the parties worked out new arrangements.  
After engaging in extensive negotiations and an arbitration, PRTC
and CCPR reached an "interconnection agreement," which provided in
paragraph IV that PRTC customers would be charged the applicable
long-distance rates unless CCPR chose to pay PRTC a fee for each
call or chose to have PRTC charge its customers a flat rate of 35
cents for each call.  The agreement was executed on September 2,
1997 and approved by the Board on September 11, 1997.  The Board
stated that the agreement was "consistent with section 252 of the
Act, local law, and the rules of this Board," as well as "non-
discriminatory and . . . consistent with the public interest,
convenience and necessity."
 CCPR never exercised either one of its options under
paragraph IV of the agreement.  In November 1997, PRTC began
charging its customers long-distance charges for the relevant
calls, retroactive to September 2, 1997.  Customers complained.  On
November 25, 1997, CCPR filed a complaint with the Board seeking a
cease and desist order prohibiting PRTC from imposing these
charges.  This matter was captioned "In the matter of Enforcement
and Implementation of the Interconnection Agreement between [CCPR]
and [PRTC]."
 CCPR says that PRTC imposed these charges, and so angered
customers who sought to call CCPR's customers, to hurt CCPR and did
so out of self-interested and anti-competitive motivations.  PRTC,
which has an affiliate that provides cellular phone services in
competition with CCPR, denies this.
 The Board held hearings on CCPR's complaint on December
10 and 15, during which numerous witnesses testified.  On December
22, 1997, the Hearing Examiner made a recommendation to the Board.  
The Examiner stated that paragraph IV of the agreement "gives PRTC
the right to charge the toll charges at issue to its landline
customers when they call a CCPR subscriber" and that under the
circumstances of the case PRTC acted properly under the agreement.  
However, the Examiner also found that "[e]ven though PRTC has the
right, in principle, under the Interconnection Agreement, to impose
toll charges, it is also legally and morally obligated to provide
adequate notice to its customers," who were not parties to the
agreement but with whom PRTC had a separate contractual
relationship, "before assessing said charges."  The Examiner
concluded that PRTC had imposed charges without notice in violation
of Article 1210 of the Puerto Rico Civil Code, P.R. Laws Ann. tit.
31,  3375, which establishes a duty to act in good faith while
fulfilling contract obligations, and "thereby breach[ed] its
fiduciary, contractual relationship with its customers which
requires acting in good faith towards them."  The Examiner stated
that PRTC could prospectively assess toll charges "only after
adequate and reasonable notification to its customers," and
suggested that thirty days advance notice would be reasonable.
 On December 24, 1997, the Board adopted this
recommendation and issued an order requiring PRTC to cease
collecting the charges and to credit or refund the charges it had
already collected.  As of that date, the issue of any future long-
distance charges was already moot (as the Board recognized),
because PRTC and CCPR had set up new switches allowing calls to be
transferred from PRTC to CCPR at local offices outside San Juan.  
Consequently, this case involves only charges imposed by PRTC on
its customers for calls made between September 2 and December 22,
1997.
 PRTC filed its federal court complaint against the Board
and CCPR on December 31, 1997.  In addition to several state law
claims, the complaint sets forth four federal causes of action.  
The first, styled "review of decision disapproving or revising
interconnection agreement," alleges that "under 47 U.S.C.
252(e)(6)" the district court has jurisdiction over decisions of
the Board "reviewing interconnection agreements"; that the Board's
decision "is tantamount to a review and rejection of an important
term of the Agreement between PRTC and CCPR" that permits PRTC to
impose the long-distance charges; and that the Board's decision
violates both Puerto Rico law and the Act because it is inequitable
and unreasonable, does not provide PRTC with compensation for the
provision of services, and does not rely on a reason for rejection
that the Act permits.
 The second cause of action is captioned "enforcement of
interconnection agreement."  PRTC alleges that the defendants "have
taken actions which make it impossible for PRTC to obtain benefits
it is entitled to under the [a]greement," that the federal courts
have jurisdiction "under 47 U.S.C.  252(e)(6)" over an action to
enforce an approved interconnection agreement, and that PRTC seeks
such enforcement.
 The third cause of action claims an unconstitutional
taking.  According to PRTC, "[b]y prohibiting PRTC from charging
its customers -- or anyone else -- for providing a service and
requiring PRTC to pay CCPR every time PRTC performs the service,
the Board . . . has effected a taking of PRTC's property without
just compensation."
 The fourth cause of action alleges that the Board's
action was "taken under color of the law of the Commonwealth of
Puerto Rico without an adequate hearing or opportunity for a
hearing" and "deprives PRTC of important property rights without
due process of law."
 After both defendants moved to dismiss pursuant to Rule
12(b)(1) and Rule 12(b)(6), the district court held that it lacked
subject matter jurisdiction over the first two causes of action and
that the third and fourth causes of action did not state claims on
which relief could be granted.  See Puerto Rico Tel. Co. v.
Telecommunications Regulatory Bd. of Puerto Rico, 20 F. Supp. 2d
308, 312 (D.P.R. 1998).  The court dismissed the action, implicitly
declining supplemental jurisdiction over PRTC's state law claims.  
 The district court based its jurisdictional holding on 47
U.S.C.  252(e)(6), which states in relevant part:
    In any case in which a State commission makes a determination
    under this section, any party aggrieved by such determination
    may bring an action in an appropriate Federal district court
    to determine whether the agreement or statement meets the
    requirements of section 251 of this title and this section.

The court stated that "a state commission to which an arbitrated
interconnection agreement is submitted must approve or reject the
agreement, and section 252(e)(6) allows for federal jurisdiction
only for review of the state commission's decision in that
context."  Id. at 310. The court concluded that it lacked
jurisdiction because the Board's order was based purely on state
law and was "not an approval or disapproval of the Agreement or a
rule regarding the Agreement's conformity with 47 U.S.C.  251,"
whereas "[t]his court has subject matter jurisdiction under the Act
only when a state regulator applies federal law in its acceptance
or rejection of an interconnection agreement."  Id. at 311.  The
court distinguished Michigan Bell Telephone Co. v. MFS Intelenet of
Michigan, Inc., 16 F. Supp. 2d 817 (W.D. Mich. 1998), on the ground
that in that case plaintiff alleged that the state commissioners'
order "interpreted the interconnection agreement . . .  in a manner
which violated federal law."  Puerto Rico Tel. Co., 20 F. Supp. 2d
at 311 (emphasis in original).
         The district court also held that plaintiff's procedural
due process claim failed because, although PRTC claimed that the
Board's order "violated specific procedures of the Act regarding
the approval and rejection of interconnection agreements," these
procedures were not applicable because the order did not in fact
reject the agreement at all.  Id.  Finally, the court held that
PRTC had not stated a takings claim because it had "not made
sufficient allegations to allow [the court] to find a recognized
property interest which has been taken from it.  PRTC did not have
a recognized property right in retroactively billing its customers,
and the Board's prevention of this action is not a taking within
the meaning of the Fifth Amendment."  Id. at 311-12.
         The district court's ruling that it lacked subject matter
jurisdiction is subject to de novo review, see Murphy v. United
States, 45 F.3d 520, 522 (1st Cir. 1995); Heno v. FDIC, 20 F.3d
1204, 1205 (1st Cir. 1994), as is its decision to dismiss the
takings and procedural due process causes of action for failure to
state a claim, see Grunbeck v. Dime Sav. Bank of New York, 74 F.3d
331, 335 (1st Cir. 1996).  We read the allegations of the complaint
liberally, treating all well-pleaded facts as true and taking all
inferences in favor of the plaintiff.  See Negron-Gaztambide v.
Hernandez-Torres, 35 F.3d 25, 27 (1st Cir. 1994); see also Aversa
v. United States, 99 F.3d 1200, 1209-10 (1st Cir. 1996).  Further,
we are "mindful that the party invoking the jurisdiction of a
federal court carries the burden of proving its existence."  Taber
Partners, I v. Merit Builders, Inc., 987 F.2d 57, 60 (1st Cir.
1993).
                              II
A.  Telecommunications Act Claims
    1.  Structure of the Act
         PRTC's claims are best understood against an explanation
of the structure of the relevant portions of the Act.
         The Act is designed to foster the rapid development of
competition in the local telephone services market.  See
Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56,
56 (stating that the purpose of the Act is "to promote competition
and reduce regulation in order to secure lower prices and higher
quality services for American telecommunications consumers and
encourage the rapid deployment of new telecommunications
technologies"); AT&T Corp. v. Iowa Utilities Bd., 119 S. Ct. 721,
726 (1999); Reno v. American Civil Liberties Union, 521 U.S. 844,
857-58 (1997).  As the legislative history explains, the Act
creates "a pro-competitive, de-regulatory national policy framework
designed to accelerate rapidly private sector deployment of
advanced telecommunications and information technologies and
services to all Americans by opening all telecommunications markets
to competition."  H.R. Conf. Rep. No. 104-458, at 113 (1996),
reprinted in 1996 U.S.C.C.A.N. 124, 124 (Joint Explanatory
Statement of the Committee of Conference); see also Bruning, The
Telecommunications Act of 1996: The Challenge of Competition, 30
Creighton L. Rev. 1255, 1256 (1997) (describing the Act as intended
"(1) to promote competition and reduce regulation to secure lower
prices and higher quality services for American telecommunications
consumers, (2) to encourage the rapid deployment of new
telecommunications technologies, and (3) to implement policies that
will prevent harm to consumers from the implementation of
competition").  Sections 251, 252, and 253 of the Act contain the
principal provisions designed to carry out these policies.
         Section 251 imposes various requirements on
telecommunications carriers, such as CCPR, and incumbent local
exchange carriers, such as PRTC.  For instance, all carriers have
a duty "to interconnect directly or indirectly with the facilities
and equipment of other telecommunications carriers."  47 U.S.C.
251(a)(1).  An incumbent carrier, which controls the existing
network to which other carriers need access in order to compete,
also has the duty to permit other carriers to interconnect with its
facilities, to provide other carriers with access to elements of
its local network on an "unbundled" basis, to sell to other
carriers at wholesale prices the services that it provides to its
customers, and to negotiate interconnection agreements in good
faith.  Id.  251(c).  The Act is also an exercise in what has been
termed cooperative federalism:  "In prescribing and enforcing
regulations to implement the requirements of [ 251], the [FCC]
shall not preclude the enforcement of any regulation, order, or
policy of a State commission that . . . establishes access and
interconnection obligations of local exchange carriers; . . . is
consistent with the requirements of this section; and . . . does
not substantially prevent implementation of the requirements of
this section and the purposes of this part."  Id.  251(d)(3).
         Section 252, which is captioned "[p]rocedures for
negotiation, arbitration, and approval of agreements," sets forth
some of the means to implement these various requirements.  First,
the incumbent carrier and the requesting carrier have the
opportunity to negotiate their own interconnection agreement.  If
those carriers can reach a compromise, they need not satisfy the
substantive requirements of  251(b) and (c).  See id.  252(a)(1).  
If they cannot agree within a certain period, either of the
carriers may petition the state commission to arbitrate unresolved
issues.  See id.  252(b)(4).  Finally, the completed agreement
must be submitted to the state commission for approval.  See id.
252(e)(1).  The commission may reject a negotiated agreement that
is "not consistent with the public interest, convenience, and
necessity" or that "discriminates against a telecommunications
carrier not a party to the agreement," id.  252(e)(2)(A), and may
reject an arbitrated agreement that fails to meet the requirements
of  251 (including the FCC's implementing regulations) or  252(d)
(which governs pricing standards), see id.  252(e)(2)(B).  
Further, notwithstanding these strictures on the grounds for
rejection, "but subject to section 253 of this title," a state
commission is not prohibited "from establishing or enforcing other
requirements of State law in its review of an agreement, including
requiring compliance with intrastate telecommunications service
quality standards or requirements."  Id.  252(e)(3).
         Section 252 also provides for federal judicial review of
certain state commission actions relating to interconnection
agreements.  Section 252(e)(6) provides:  "In any case in which a
State commission makes a determination under this section, any
party aggrieved by such determination may bring an action in an
appropriate Federal district court to determine whether the
agreement . . . meets the requirements of section 251 of this title
and this section."  Id.  252(e)(6).  Also,  252(e)(4), which sets
forth the schedule for state commission approval or rejection,
provides that "[n]o State court shall have jurisdiction to review
the action of a State commission in approving or rejecting an
agreement under this section."  Id.  252(e)(4).
         Section 253, which is not restricted to matters relating
to interconnection agreements, requires the FCC to preempt the
enforcement of state and local laws that "may prohibit or have the
effect of prohibiting the ability of any entity to provide any
interstate or intrastate telecommunications service."  Id.
253(a), (d).  Like  251 and  252,  253 also contains
provisions that preserve state regulatory authority:  "Nothing in
this section shall affect the ability of a State to impose, on a
competitively neutral basis and consistent with section 254 of this
section [which sets forth "universal service" provisions],
requirements necessary to preserve and advance universal service,
protect the public safety and welfare, ensure the continued quality
of telecommunications services, and safeguard the rights of
consumers."  Id.  253(b); see also id.  253(c).
         Against this background, we test PRTC's attempt to assert
federal jurisdiction.  Section 252(e)(6) is PRTC's sole basis for
its assertion of subject matter jurisdiction over its
Telecommunications Act claims.  In interpreting this provision, we
"will not look merely to a particular clause in which general words
may be used, but will take in connection with it the whole statute
. . . and the objects and policy of the law."  Stafford v. Briggs,
444 U.S. 527, 535 (1980) (quoting Brown v. Duchesne, 60 U.S. (19
How.) 183, 194 (1857)) (internal quotation marks omitted); see
also, e.g., Crandon v. United States, 494 U.S. 152, 158 (1990).
    2.  Application of the Act to PRTC's Claims
         Given the nature of PRTC's claims,  252(e)(6) does not
confer federal jurisdiction here.
         It is clear that this provision covers approvals or
rejections by state commissions of interconnection agreements, but
that is not what is involved here.  It is less clear whether the
provision also covers "determination[s]" that are not approvals or
rejections.  Even if the Act permits federal judicial review of
such determinations, there is no federal jurisdiction over this
case.  The portion of the Board's order as to which PRTC is
aggrieved does not have a sufficient nexus to the interconnection
agreement between PRTC and CCPR to be a "determination" under  252
and so to fall within the jurisdictional bounds of  252(e)(6).  
Even assuming that there were an adequate nexus, PRTC's claims in
the end amount to an assertion that the Board failed to comply with
state law provisions.  There is no federal jurisdiction over such
claims.
         a.  "[D]etermination" under  252
         As an initial matter, PRTC's contention that the Board's
order amounted to a rejection of the parties' interconnection
agreement is simply wrong.  There is no dispute that the Board
approved the interconnection agreement in September 1997, and that
it stated in its December order that PRTC was entitled under the
agreement to impose the disputed charges.  The agreement remained
in effect at all times.  The Board objected, under Puerto Rico law,
to the manner in which PRTC chose to impose the charges, a matter
that was not covered by the agreement and that affected people who
were not parties to the agreement.  
         Another issue presented by the parties is not necessary
for resolution of this case.  The parties vigorously argue about
whether  252(e)(6) confers federal court jurisdiction over state
commission "determination[s]" that are interpretations of,
enforcements of, or refusals to enforce existing interconnection
agreements.  Alone among the parties, the Board contends that only
its orders approving or rejecting agreements are subject to federal
judicial review.  Both PRTC and CCPR (otherwise adverse), as well
as amicus curiae MCI Worldcom, Inc., contend that federal judicial
review is broader.  There is some support for the broader view.  
Several courts have held that interpretations and enforcements of
agreements are implicitly covered by  252 and so are also covered
by  252(e)(6).  See Illinois Bell Tel. Co. v. Worldcom Techs.,
Inc., 179 F.3d 566, 769-71 (7th Cir. 1999); Iowa Utilities Bd. v.
FCC, 120 F.3d 753, 804 & n.24 (8th Cir. 1997) (stating in dicta
that "[w]e believe that the enforcement decisions of state
commissions would also be subject to federal district court review
under subsection 252(e)(6)"), aff'd in part and rev'd in part on
other grounds, AT&T Corp. v. Iowa Utilities Bd., 119 S. Ct. 721
(1999).  We need not and do not decide this issue; we assume
arguendo, in PRTC's favor, that review under  252(e)(6) is not
limited to initial acceptances and rejections of agreements.
         Nevertheless,  252(e)(6), which authorizes review in
cases in which "a State commission makes a determination under [
252]," clearly requires at least a substantial nexus between the
commission's determination and an interconnection agreement.  The
whole subject of  252 is such agreements -- the procedure for
putting them into place, the standards for the prices they contain.  
"[D]etermination" is used elsewhere in  252 to refer to decisions
about the specific provisions of agreements, such as the rates they
will specify.  See 47 U.S.C.  252(d)(1) (discussing
"[d]eterminations by a State commission of the just and reasonable
rate for the interconnection of facilities and equipment").  And
the language of  252(e)(6) focuses the court's review on the
agreement itself.  See Indiana Bell Tel. Co. v. McCarty, 30 F.
Supp. 2d 1100, 1103 (S.D. Ind. 1998) ("Jurisdiction exists under
the Act only if the following three prerequisites are satisfied:
(1) the claim regards a State commission determination; (2) the
claimant is an aggrieved party; and (3) the claimant seeks review
of whether a statement or an agreement between an interconnecting
service provider and a local exchange carrier satisfies the
requirements of sections 251 and 252."); GTE Florida Inc. v.
Johnson, 964 F. Supp. 333, 335 (N.D. Fla. 1997) ("[Section
252(e)(6)] of the Act . . . makes clear that this court has
jurisdiction only 'to determine whether the agreement or statement
meets the requirements of' the Act."); GTE South Inc. v. Morrison,
957 F. Supp. 800, 804 (E.D. Va. 1997); Citizens' Utility Ratepayer
Bd. v. McKee, 946 F. Supp. 893, 895 (D. Kan. 1996) (stating that
federal court jurisdiction under  252(e)(6) is "not without
limits" and that "the court may hear . . . only those actions in
which an aggrieved party seeks a determination of whether the
agreement between the interconnecting service provider and the
local exchange carrier satisfies the requirements of sections 251
and 252").
         Indeed, the courts that have thus far extended
252(e)(6) review to post-approval/rejection determinations have
done so in circumstances, such as a state commission's
interpretation of a term in the agreement, in which the
commission's determination was closely tied to the agreement
itself.  See, e.g., Illinois Bell Tel. Co., 179 F.3d at 571-72
(deciding whether a state commission's interpretation of the
reciprocal compensation provisions of an interconnection agreement
regarding calls to Internet service providers violated federal
law); Taylor Communications Group, Inc. v. Southwestern Bell Tel.
Co., 172 F.3d 385, 388 (5th Cir. 1999) (assuming without any
mention of the issue that federal court has subject matter
jurisdiction over an action challenging a state commission's
interpretation of the reciprocal compensation provisions of an
existing interconnection agreement); cf. Wisconsin Bell, Inc. v.
TCG Milwaukee, Inc., 27 F. Supp. 2d 1145, 1146-48 (W.D. Wis. 1998)
(leaving open the question of whether the court has jurisdiction
over a state commission decision interpreting the phrase "local
traffic" in an existing interconnection agreement to include calls
to Internet service providers).  
         The pertinent question here is whether the Board
determination as to which PRTC is aggrieved has a sufficient nexus
to the interconnection agreement between PRTC and CCPR to fall
within the broad interpretation of  252(e)(6) for which PRTC
argues.  Because the parties use the terms "interpretation" and
"enforcement" almost exclusively, we review whether the Board's
order can be placed in either of these two categories, although
those terms are not talismanic and cannot be found anywhere
relevant in  252 itself.  The order does not fit in either
category.
         First, the relevant portion of the Board's order does not
interpret the agreement.  This point is slightly obscured by the
fact that the state commission order issued to resolve a proceeding
in which CCPR argued that PRTC's actions had violated the
interconnection agreement.  This proceeding may well have been, as
PRTC alleges, focused on the agreement and how it should be
interpreted.  Indeed, the Board's December 1997 order actually does
interpret the interconnection agreement.  But this is not the
portion of the Board's order as to which PRTC is "aggrieved," see
47 U.S.C.  252(e)(6), and it is not the portion that PRTC
challenges.  PRTC won before the Board on the issue of the
interconnection agreement's meaning, and would surely like that
aspect of the order to stand.  What PRTC is "aggrieved" about is
the Board's application of Puerto Rico law to relieve PRTC's
customers of any duty to pay what the Board characterized as
retroactive or surprise charges.  This application is not in any
sense an interpretation of the agreement; the agreement only
defines the relationship between CCPR and PRTC, and does not
address the relationship between PRTC and its customers or the
issue of notice.  
         Nor, although the question is a closer one, is the
Board's order sufficiently connected to the interconnection
agreement to be considered a refusal to enforce that agreement.  
The agreement itself was upheld (in the portion of the Board's
order that PRTC does not contest), but it could not be carried out
in just the way that PRTC wanted to carry it out because of the
operation of separate principles of law.   These principles,
defining the content of "good faith" under Article 1210 of the
Puerto Rico Civil Code, are concerned with the rights of telephone
company customers vis--vis the carriers.  The agreement simply did
not give PRTC the right to refuse to comply with otherwise
applicable law.  Cf. Michigan Bell Tel. Co. v. Strand, 26 F. Supp.
2d 993, 1000 (W.D. Mich. 1998) (dismissing for failure to state a
claim plaintiff's assertion that a state commission order issued
after the approval of an interconnection agreement had the effect
of replacing the existing agreement with something new, since the
state commission's action was permissible state regulation under  
261(c)).
         It is not enough to establish a nexus that the order
adversely affects a carrier.  It is true that here the effect of
the Board's order is that PRTC will not be able to collect any
charges from its customers for certain calls made over a period of
approximately four months.  But that effect does not make the
Board's decision a decision about the agreement.  The fact that the
particular charges as to which PRTC failed to give notice were
specified in an interconnection agreement is not enough.  PRTC's
inability to collect the charges is due to its own choice about a
matter not covered by the agreement -- the manner of collecting the
charges -- and not to any inconsistency between the agreement
itself (which is not inherently infirm) and Puerto Rico law.
         It may also be true that the Board's order had some
effect on competition in the Puerto Rico market.  The parties argue
about whether PRTC's initial actions were anticompetitive, intended
to give an advantage to its own affiliated cellular phone company
over CCPR, and whether the Board's order in effect gave CCPR a
better deal than it had bargained for.  The provisions of  253
constitute at least an implicit recognition that state commission
decisions made outside the  252 context can have such an impact.  
If a state commission determination "prohibit[s] or [has] the
effect of prohibiting the ability of any entity to provide any
interstate or intrastate telecommunications service," the aggrieved
party can petition the FCC to preempt it.  47 U.S.C.  253(a), (d).  
But the mere fact that the Board's order, which obviously did not
amount to such a prohibition, impacted the market in some way does
not demonstrate an adequate nexus with the interconnection
agreement.   
         PRTC argues that the Board's order is nonetheless a
"determination under"  252 in that the Board's application of
Puerto Rico law fits under  252(e)(3), which states that "nothing
in this section shall prohibit a State commission from establishing
or enforcing other requirements of State law in its review of an
agreement" (emphasis added).  But the relevant portion of the
Board's order was not the "review of an agreement."
         The Board's actions fit much more naturally under
253(b), which provides that the Act's preemption provision shall
not "affect the ability of a State to impose, on a competitively
neutral basis and consistent with section 254 of this section
[which deals with "universal service"], requirements necessary to
preserve and advance universal service, protect the public safety
and welfare, ensure the continued quality of telecommunications
services, and safeguard the rights of consumers."  To the extent
that the relevant portion of the order can be considered a
determination under any section of the Act,  253, with its
specific reference to consumer protection, applies better than
252.
         The Board's order was not, in conclusion, a
"determination" under  252, because it was insufficiently linked
to the parties' interconnection agreement.  Although the order may
have affected the parties' agreement in a secondary way, Congress
-- although it could have spoken more broadly, cf., e.g., 28 U.S.C.
1338 (conferring on the federal courts exclusive jurisdiction
over any action arising under a federal statute "relating to"
patents and copyrights) -- did not choose to grant the federal
courts jurisdiction over any state commission determination that
merely relates to or has some effect on an interconnection
agreement or on competition between the players in a local
telecommunications market.  Our resolution avoids federal judicial
review of a range of state commission determinations.  Given the
proliferation of interconnection agreements, see Endejan, Cable's
"Other Hat" -- Providing Telecommunications Services, 551 PLI/Pat
291, 296 (Mar.-Apr. 1999) (stating that about 2400 interconnection
agreements had been reached by the Act's second anniversary), it is
easy to predict that an agreement will often be in the background
and be potentially affected in some way by state commission
rulings, including consumer protection rulings such as the one in
this case.
         b.  "[R]equirements of section 251 of this title and  
         [section 252]"

         Even were we wrong and the Board's order could be
considered a "determination" under  252, we would still affirm the
district court's dismissal because the claims are outside of the
limited scope of review federal courts are afforded by  252(e)(6).  
         Different parties have staked out different positions on
the scope of that review.  PRTC says that review of all state law
issues involved in Board action is available.  CCPR and MCI say
that whether there is federal jurisdiction does not necessarily
depend on whether the state commission decision is based on state
or federal law.  The district court was apparently of the view that
no review is ever available in federal court of any application of
state law by the state commission.  The views of PRTC and of the
district court are in error, and we elaborate on why we have chosen
a middle ground instead and why nonetheless the claims here are not
subject to federal judicial review.
         Section 252(e)(6) does not confer authority on federal
courts to review the actions of state commissions for compliance
with state law.  In this we agree with the conclusion of the
Seventh Circuit.  See Illinois Bell Tel. Co., 179 F.3d at 572; see
also MCI Telecomms. Corp. v. Illinois Commerce Comm'n, Nos. 98-
2127, 98-2256, 1999 WL 447547, at *5 (7th Cir. June 23, 1999),
reh'g granted on other grounds, 1999 WL 455700 (7th Cir. June 25,
1999); cf., e.g., U.S. West Communications, Inc. v. AT&T
Communications of the Pacific Northwest, Inc., 31 F. Supp. 2d 839,
843-44 (D. Or. 1998).
         PRTC argues that since  252(e)(3) preserves states
commissions' authority to apply state law when "review[ing]" an
agreement, application of correct state law must be considered one
of the "requirements" of  252, and federal courts therefore can
review a state commission's determination for compliance with state
law even if that determination is totally consistent with the
substantive and procedural requirements of federal law.  See 47
U.S.C.  252(e)(3), (e)(6).
         This argument fails.  First, it is an untenable
linguistic leap to construe a preservation of state authority, an
explicit acknowledgment that there is room in the statutory scheme
for autonomous state commission action, as constructing some kind
of "requirement."  Further, the structure of and the use of similar
phrases in the relevant provisions argue against PRTC's position.  
For instance, in  251(d)(3), a provision analogous to  252(e)(3),
Congress stated that "the Commission shall not preclude the
enforcement of any . . . order . . of a State commission that . .
. is consistent with the requirements of this section" and "does
not substantially prevent implementation of the requirements of
this section."  Id.  251(d)(3).  The use of "requirements of this
section" here illustrates that the phrase is intended to refer to
something outside state law, something that state law can be
compared to -- namely, the requirements of the federal law.  Also,
PRTC's view that  252(e)(3) requires consistency with existing
state law, which PRTC roots in assumptions about congressional
intent, is a gloss not found anywhere in the statute.
         Indeed, it is the very existence of the savings clause
in  252 that makes the last phrase in  252(e)(6) necessary and
meaningful.  As the Seventh Circuit explained:  "Because
subsections 252(e)(3) and (f)(2) allow a state commission to
consider state law when approving an agreement, we think it clear
that subsection 252(e)(6) includes the 'agreement' language[, "to
determine whether the agreement . . . meets the requirements of
section 251 of this title and this section,"] . . . to clarify that
federal courts may review a state commission's actions with respect
to an agreement only for compliance with the requirements of  251
and  252 of the Telecommunications Act, and not for compliance
with state law."  MCI Telecomms. Corp., 1999 WL 447547, at *5.  If
Congress intended federal courts' review to encompass any kind of
alleged legal flaw in a state commission's determination, then
there would have been little need to include the language "meets
the requirements of section 251 . . . and [section 252]."  See
generally Ratzlaf v. United States, 510 U.S. 135, 140-41 (1994)
(citing Pennsylvania Dep't of Public Welfare v. Davenport, 495 U.S.
552, 562 (1990)).
         Second, our interpretation is in keeping with the general
policy expressed in the statute of recognizing state authority over
certain aspects of local telecommunications -- in areas over which
the states held virtually exclusive sway prior to the enactment of
the Act -- while ensuring compliance with federal law.  The Act
exemplifies a cooperative federalism system, in which state
commissions can exercise their expertise about the needs of the
local market and local consumers, but are guided by the provisions
of the Act and by the concomitant FCC regulations, see AT&T Corp.,
119 S. Ct. at 733 ("While it is true that the 1996 Act entrusts
state commissions with the job of approving interconnection
agreements, . . . these assignments . . . do not logically preclude
the Commission's issuance of rules to guide the state-commission
judgments."), and checked by federal court review for consistency
with these federal provisions.  See generally City of Abilene v.
FCC, 164 F.3d 49, 53 (D.C. Cir. 1999) (stating that  253(b) and
(c) "set aside a large regulatory territory for State authority");
H.R. Conf. Rep. No. 104-458, at 126 (1996), reprinted in 1996
U.S.C.C.A.N. 124, 137 ("Agreements arrived at through voluntary
negotiation or compulsory arbitration must be approved by the State
commission under new section 252(e), which . . . preserves State
authority to enforce State law requirements in agreements approved
under this section.").  It would be "surpassing strange" to
preserve state authority in this fashion and then to put federal
courts in the position of overruling a state agency on a pure issue
of state law.  AT&T Corp., 119 S. Ct. at 730 n.6.  See generally
Aegerter v. City of Delafield, 174 F.3d 886, 887 (7th Cir. 1999)
("The Telecommunications Act of 1996 was nothing if not a complex
balancing act among many conflicting interests.  Not the least of
these were the interests of state and local governments in
continuing to regulate certain aspects of this industry, and the
need for a uniform federal policy."); Town of Amherst v. Omnipoint
Communications Enters., Inc., 173 F.3d 9, 17 (1st Cir. 1999);
Rosario & Kohler, The Telecommunications Act of 1996:  A State
Perspective, 29 Conn. L. Rev. 331, 332 (1996) (suggesting that in
the wake of the Act "states should be afforded flexibility to craft
regulation to the needs of their local markets" and that states
should focus on "consumer protection").
         It is true, as PRTC points out, that this interpretation
of  252(e)(6) creates a possible gap in review for a narrow class
of cases.  But this case is not among them.  This possibility
exists because  252(e)(4) states that "[n]o State court shall have
jurisdiction to review the action of a State commission in
approving or rejecting an agreement under this section."  
Therefore, PRTC argues, our interpretation means that there will be
no judicial review in cases involving acceptance or rejection of an
interconnection agreement in which the only issue raised is
compliance with state law.  We do not purport to interpret
252(e)(4); this case clearly does not involve an acceptance or a
rejection.   
         The district court applied a version of this schema, but
went too far in disallowing review of state commission
"determination[s]" that are based on state rather than federal law.  
See Puerto Rico Tel. Co., 20 F. Supp. 2d at 311 (stating that
"[t]his court has subject matter jurisdiction under the Act only
when a state regulator applies federal law in its acceptance or
rejection of an interconnection agreement").  It is perfectly
conceivable that a state commission decision based on state law
about an interconnection agreement could come in conflict with or
violate some provision of  251 or  252.  Such a decision would be
reviewable, although a decision based on state law that is
consistent with federal law but arguably wrong on state law grounds
would not be.  See Michigan Bell Tel. Co. v. MFS Intelenet of
Michigan, Inc., 16 F. Supp. 2d 817, 824 & n.6 (W.D. Mich. 1998).
         PRTC's argument has not been so subtle; it contends that
252(e)(6) applies here because the Board acted in violation of
state law and therefore automatically violated  252.  Although
PRTC's complaint alleges generally that the Board's decision was in
violation of federal law, PRTC cannot rest on such vague
generalities here, but must identify the portions of the Act that
it claims are at issue and give some reasoned explanation in
support of its contentions.  See generally McCoy v. MIT, 950 F.2d
13, 22-23 (1st Cir. 1991) (stating in a motion to dismiss context
that "the plaintiff has an affirmative responsibility to put his
best foot forward in an effort to present some legal theory that
will support his claim").
         The only "requirement" of  251 or  252 that PRTC
identifies in its argument to this court is  252(h), which
provides that "[a] State commission shall make a copy of each
agreement approved under subsection (e) of this section . . .
available for public inspection and copying within 10 days after
the agreement . . . is approved."  47 U.S.C.  252(h).  This
assertion of inconsistency with federal law is plainly unsupported
on the face of plaintiff's own complaint.  The Board's order
approving the interconnection agreement says that, pursuant to
252(h), a copy of the agreement will be made available.  PRTC
does not allege that this was not done.  What PRTC appears to be
arguing is that the availability of the interconnection agreement
to the public under  252(h) means that the public had sufficient
notice of the charges and that the Board's order requiring prior
notice to customers before imposition of the charges was therefore
erroneous.  But  252(h) does not prevent and is not inconsistent
with a more stringent state-law-based actual notice requirement.  
Cf. In re Implementation of the Local Competition Provisions in the
Telecommunications Act of 1996, 11 FCC Rcd. 15499, 1996 WL 452885,
at *18 (1996) (First Report & Order) ("The rules that the FCC
establishes . . . are minimum requirements upon which the states
may build.").
B.  Takings and Due Process Claims
         In its takings claim, PRTC has to establish two
propositions:  that a protectable property interest is involved and
that the government action is a taking without just compensation.  
It fails at both.
         The Takings Clause of the Fifth Amendment, which is
applicable to the states through the Fourteenth Amendment, provides
that "private property" shall not "be taken for public use, without
just compensation."  U.S. Const. amend. V; Webb's Fabulous
Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 160 (1980).  A
plaintiff "must first establish an independent property right
before [it] can argue that the state has taken that right without
just compensation."  Parella v. Retirement Bd. of the Rhode Island
Employees' Retirement Sys., 173 F.3d 46, 58 (1st Cir. 1999).  An
enforceable contract right can in some circumstances provide the
necessary property right.  See id. at 58-59; see also National
Educ. Ass'n-Rhode Island v. Retirement Bd. of the Rhode Island
Employees' Retirement Sys., 172 F.3d 22, 29 (1st Cir. 1999) (noting
that in the takings context the property concept has been extended
to "materialmen's liens" and "trade secrets protected under state
law" but not to "unilateral expectation[s]" such as "riparian
rights recognized under state law, railroad pensions, and future
social service benefits").
         Second, once a property right has been established,
courts analyze whether the state has effected a regulatory taking
by considering "the character of the government action, its
economic impact on the plaintiff, and the degree to which it
interferes with the plaintiff's reasonable, investment-backed
expectations."  Houlton Citizens' Coalition v. Town of Houlton, 175
F.3d 178, 190 (1st Cir. 1999); see also National Educ. Ass'n, 172
F.3d at 30 n.11 (noting that "investment-backed expectations" are
used to decide the takings question "after a property right is
found to exist"); Peterson v. United States Dep't of the Interior,
899 F.2d 799, 813 (9th Cir. 1990) (stating that a constitutionally
protected property interest cannot be "spun out of the yarn of
investment-backed expectations").  A monopoly operating in a highly
regulated industry should expect that its business will frequently
be affected by government action.  See Connolly v. Pension Benefit
Guaranty Corp., 475 U.S. 211, 227 (1986); Philip Morris, Inc. v.
Harshbarger, 159 F.3d 670, 679 (1st Cir. 1998); McAndrews v. Fleet
Bank of Mass., N.A., 989 F.2d 13, 19 (1st Cir. 1993).
         As to the first prong, PRTC does not argue that the
Board's ruling constitutes a taking of tangible property.  Rather,
it argues that it has a property interest in the contractual right
established in paragraph IV of the interconnection agreement, in
which CCPR agreed that PRTC could charge PRTC customers long-
distance charges for certain calls.  Assuming that a contract
between two private entities that has been approved by a state
agency can create the necessary property right, PRTC's argument
nevertheless fails.
         "The critical and threshold question is whether
appellant's interest . . . is grounded in substantive legal
relationships defined by . . . specific state or federal rules of
law." Davila-Lopes v. Zapata, 111 F.3d 192, 195 (1st Cir. 1997)
(internal quotation marks omitted); see also Lowe v. Scott, 959
F.2d 323, 337 (1st Cir. 1992) ("The hallmark of property, the Court
has emphasized, is an individual entitlement grounded in state law,
which cannot be removed except for cause."  (quoting Logan v.
Zimmerman Brush Co., 455 U.S. 422, 430 (1982)) (internal quotation
marks omitted)).  PRTC's argument does not address the relevant
"legal relationship": although the interconnection agreement may
give PRTC rights vis--vis CCPR, it cannot grant PRTC the
underlying ability to charge, without prior notice, its landline
customers, who were not parties to the agreement, for the relevant
calls.  The Board's action did not take away rights that PRTC had
against CCPR; the Board dealt only with the manner in which PRTC
undertook to impose the charges discussed in the agreement.  
Without establishing some separate agreement with the customers,
enforceable under Puerto Rico law, or some independent provision of
that law entitling it to the particular charges at issue, PRTC has
not shown that its interest in those charges was more than a
"unilateral expectation."  Board of Regents v. Roth, 408 U.S. 564,
577 (1972) ("Property interests . . . are not created by the
Constitution.  Rather they are created and their dimensions are
defined by existing rules or understandings that stem from an
independent source such as state-law rules or understandings that
secure certain benefits and that support claims of entitlement to
those benefits."), cited in Washington Legal Found. v.
Massachusetts Bar Found., 993 F.2d 962, 973 (1st Cir. 1993); cf.
National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry.
Co., 470 U.S. 451, 470-71 (1985); TCG Milwaukee, Inc. v. Public
Serv. Comm'n of Wisconsin, 980 F. Supp. 992, 1002 (W.D. Wis.
1997).
         PRTC also does not meet the second prong.  Accepting that
the failure to collect the charges will undoubtedly have some
economic impact on PRTC, it is still true that the Board's action
is a "public program that adjusts the benefits and burdens of
economic life to promote the common good" in a highly regulated
context.  McAndrews, 989 F.2d at 19 (citation and internal
quotation marks omitted); see also Eastern Enters. v. Apfel, 118 S.
Ct. 2131, 2149 (1998) (plurality opinion) ("Congress has
considerable leeway to fashion economic legislation, including the
power to affect contractual commitments between private parties.  
Congress also may impose retroactive liability to some degree . .
. ."); cf. Houlton, 175 F.3d at 191 (discussing analogous Contract
Clause claim).
         Similar defects lead us to affirm the district court's
dismissal of PRTC's procedural due process claim.  "An expectation
that is not 'property' for purposes of the Takings Clause may yet
sometimes entitle the citizen to procedural protection, and
substantive protection against arbitrariness, before the
expectation is cut off by government action."  National Educ.
Ass'n, 172 F.3d at 29-30; see also, e.g., Memphis Light, Gas &
Water Div. v. Craft, 436 U.S. 1, 9 (1978) ("The Fourteenth
Amendment places procedural constraints on the actions of
government that work a deprivation of interests enjoying the
stature of 'property' within the meaning of the Due Process
Clause.").  However, PRTC essentially relies on its Takings Clause
arguments to demonstrate the existence of a property right subject
to constitutional procedural protections.  Because in this case
plaintiff's claims of a protected property interest under both the
Takings Clause and the Due Process Clause depend on the existence
of a particular kind of contractual right under the interconnection
agreement, the determination that such a right does not exist
resolves both claims.  See Rhode Island Laborers' Dist. Council v.
Rhode Island, 145 F.3d 42, 44 n.1 (1st Cir. 1998); see also Roth,
408 U.S. at 577.
         Further, even assuming the existence of a protectable
property right for due process purposes, PRTC cannot show on the
facts alleged that it did not receive the process it was due.  See
generally Mathews v. Eldridge, 424 U.S. 319, 334-35 (1976).  The
undisputed facts show that the Board held two days of trial-type
hearings during which PRTC had the opportunity to present evidence
and to challenge CCPR's evidence before a neutral decisionmaker,
and that the Board ultimately rendered its ruling and gave
supporting reasons in a written decision.  PRTC knew that these
hearings involved its right to impose the long-distance charges on
its customers, and, as the exhibits to PRTC's complaint
demonstrate, PRTC was also aware that the Board was concerned with
the issue of notice to those customers.
         In the end, PRTC appears to be primarily contending not
that it was ignorant that consumer protection issues were
potentially of concern to the Board, but that it was not afforded
adequate notice of the particular adjudicatory holding that the
Board ultimately adopted.  While PRTC's complaint is real, and we
have some sympathy, constitutionally adequate notice does not
necessarily involve notice of a particular outcome.  Notice is
sufficient as long as it is "reasonably calculated, under all the
circumstances, to apprise interested parties of the pendency of the
action and afford them an opportunity to present their objections,"
Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314
(1950); see also Dionne v. Bouley, 757 F.2d 1344, 1354 (1st Cir.
1985), and "the affected individual has had a fundamentally fair
chance to present his or her side of the story," In re Nineteen
Appeals Arising Out of the San Juan DuPont Plaza Hotel Fire Litig.,
982 F.2d 603, 611 (1st Cir. 1992); see also Mathews, 424 U.S. at
333 (requiring "the opportunity to be heard 'at a meaningful time
and in a meaningful manner'" (quoting Armstrong v. Manzo, 380 U.S.
545, 552 (1965))).
         Further, if PRTC did not have notice of a contemplated
thirty-day requirement before the Board's proceedings commenced,
PRTC still had some chance to challenge that requirement, which did
not involve charges for future calls.  Once PRTC was informed of
the specific outcome (which was suggested in the Hearing Examiner's
recommendations to the Board and then adopted by the Board itself),
it had the opportunity to challenge the Board's interpretation of
Puerto Rico law through a request to the Board for a stay and for
reconsideration and through an action in the Puerto Rico courts.  
Cf. Rumford Pharmacy, Inc. v. City of East Providence, 970 F.2d
996, 999 (1st Cir. 1992); Amsden v. Moran, 904 F.2d 748, 755 (1st
Cir. 1990).
         Both the takings and due process inquiries are typically
fact- and context-sensitive ones.  On the theory it has properly
presented here, PRTC has not adequately established the existence
of a property right or alleged other facts sufficient to support
either type of claim.  See, e.g., Tri-State Rubbish, Inc. v. Waste
Management, Inc., 998 F.2d 1073, 1082 (1st Cir. 1993) (affirming
grant of motion to dismiss takings claim); Quinn v. Bryson, 739
F.2d 8, 10-11 (1st Cir. 1984) (affirming grant of motion to dismiss
procedural due process claim).
                             III
    "It would be gross understatement to say that the
Telecommunications Act of 1996 is not a model of clarity."  AT&T
Corp., 119 S. Ct. at 738.  Nevertheless, in this case the Act does
not confer on the federal courts the authority to review PRTC's
telecommunications claims.  PRTC's takings and due process claims
likewise fail, and the district court was not outside the bounds of
its discretion in dismissing the action, thereby declining to
retain supplemental jurisdiction over PRTC's state law claims.  See
28 U.S.C.  1367(c); United Mine Workers v. Gibbs, 383 U.S. 715,
726 (1966).  To the extent that other fora, such as the courts of
Puerto Rico and the FCC, are open to PRTC (a question that we do
not purport to decide), PRTC can pursue an action in those fora.   
    The judgment of the district court is affirmed.  Costs to
appellees.     

</body>

</html>